UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
KRISTINE SEITZ,

                          Plaintiff,

          - against -

NEW YORK STATE, STATE UNIVERSITY
OF NEW YORK AT STONY BROOK, JOHN
PETER GERGEN in his official and individual
capacities, and MARVIN H. O'NEAL, in his
official and individual capacities,

                          Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
2:18-CV-4149 (PKC) (LB)

PAMELA K. CHEN, United States District Judge:

On July 20, 2018, Plaintiff Kristine Seitz, proceeding *pro se*, initiated this employment discrimination action against New York State, the State University of New York at Stony Brook (the "University"), and two employees of the University—John Peter Gergen and Marvin H. O'Neal (the "Individual Defendants"). Plaintiff alleges violations of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.* ("ADEA"), the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, Section 1983 of the Title 42 of the United States Code, 42 U.S.C. § 1983 ("§ 1983"), and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 *et seq.* (*See* Second Amended Complaint ("SAC"), Dkt. 13, at 3.) Currently before the Court is Defendants' motion to dismiss Plaintiff's SAC in its entirety. (*See* Defendants' Motion to Dismiss, Dkt. 20-5.) For the reasons stated herein, Defendants' motion is granted in part and denied in part.

# BACKGROUND

## I. Factual Allegations[1]

Plaintiff has worked in the University's Undergraduate Biology program for 14 years, and she has held the title of Assistant Curator since 2006. (SAC, Dkt. 13, at 5–6.) As an assistant curator, Plaintiff is responsible for, *inter alia*, "working with faculty to design, implement[,] and trouble-shoot labs, maint[aining] lab equipment and supplies, preparing laboratory materials such as chemicals and cultures[,] and collecting live specimens from the campus and its surrounds." (*Id.* at 6.) Plaintiff was granted tenured status in 2013. (*Id.*) As of the filing of her complaint in 2018, Plaintiff was 51 years old. (*Id.* at 5.) Defendant Marvin O'Neal became a lecturer for the Biology program in approximately 2007. (*Id.* at 6.) Defendant Peter Gergen replaced non-party Eugene Katz as the director of the Biology program in 2010. (*Id.* at 6–7.)

### A. Alleged Harassment by Defendant O'Neal

After O'Neal became a lecturer in 2007, he declared that he intended to "get[] rid of the dead wood" in the department and "replac[e] them with young, fresh faces." (*Id.* at 6.) At that time, "the vast majority of the professional staff [including assistant curators] were older than O'Neal." (*Id.*)

O'Neal was aggressive toward Plaintiff. (*Id.* at 7.) He would find Plaintiff when she was alone and badger Plaintiff with work-related questions, even though O'Neal could have gotten the answer elsewhere or the questions were ones that Plaintiff could not answer. (*Id.* at 8.) When Plaintiff did not know the answer, O'Neal would raise his voice and step closer to Plaintiff, using his height to crowd and intimidate Plaintiff. (*Id.*) O'Neal would also stand in front of the door to

---

[1] The facts recited in this section are based on the allegations in the SAC, which the Court accepts as true for purposes of Defendants' motion. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

block the exit, which scared Plaintiff. (*Id.*) If Plaintiff was able to leave the room, O'Neal would follow Plaintiff, sometimes to Plaintiff's office, and continue to harass her. (*Id.*) Plaintiff was increasingly "alarmed" by these episodes and would often cry after these encounters. (*Id.*)

Plaintiff talked to a counselor at the University's Employee Assistance Program ("EAP") in 2008, and after failed attempts at mediation between Plaintiff and O'Neal, the EAP counselor referred the matter to the union. (*Id.* at 8−9.) Afterwards, O'Neal's aggression toward Plaintiff subsided.[2] (*Id.* at 9.) However, O'Neal continued to regularly call Plaintiff "anti-student" and "disorganized." (*Id.*) O'Neal also regularly sent emails to Plaintiff's supervisor, Mary Bernero, complaining that Plaintiff was incompetent and insubordinate, and offered to help Bernero "get [Plaintiff] in line." (*Id.* at 9−10.) These comments continued up to the amending of the complaint in this action. (*Id.* at 10.)

### B.    Alleged Harassment by Defendant Gergen

Plaintiff was told by her supervisor, Bernero, that Gergen, the director of the University's Biology program, referred to the older members of the staff as "toxic" and a "cabal." (*Id.* at 10, 12.) Gergen said to Plaintiff on one occasion that "he didn't even know why [Plaintiff] worked [here]" and also wrote to Plaintiff that he was enraged because Plaintiff did not complete her tasks without question. (*Id.* at 10.) In addition, Gergen has publicly screamed at other people to give him their resignation. (*Id.*) On August 18, 2017, Gergen became enraged over a disagreement with Plaintiff and stuck his finger in Plaintiff's face, "[r]ed-faced, spitting[,] and screaming." (*Id.*) Plaintiff was backed into a wall and, crying, escaped to her office. (*Id.*) Al Wilkinson, one of

---

[2] Two other women reported similar behavior by O'Neal to the union, the University's Labor Relations Department ("Labor Relations"), and its Office of Institutional Diversity and Equity ("OIDE") in 2018. (*Id.* at 9.)

Plaintiff's Biology Department colleagues, reported this incident to OIDE, but was told that the allegations were unfounded. (*Id.*)

### C. Defendant Gergen's Removal of Plaintiff's Supervisory Duties

Shortly after Gergen took over as the director of the Biology department, he changed the supervisory structure of the professional staff, based on staff interviews and discussions. (*Id.* at 7.) As a result, Plaintiff lost her supervisory duties and was told that it was due to her engaging in "inappropriate relationships." (*Id.*)

### D. Plaintiff's 2011 FMLA Application

Plaintiff filed for FMLA protection in January 2011, but was told that Gergen felt that people who applied for FMLA were "screwing the department." (*Id.* at 17−18.) Plaintiff does not allege that her application was denied.

### E. Plaintiff's Tenure Application

Plaintiff obtained tenure in 2013. (*Id.* at 6.) When Plaintiff applied for tenure, O'Neal and two lecturers whom O'Neal supervised at the time wrote a letter recommending against granting Plaintiff tenure. (*Id.* at 9.) Gergen decided not to submit this letter, because "[Plaintiff's] other letters were so good that he felt he couldn't use O'Neal's." (*Id.*)

### F. Plaintiff's 2016 FMLA Application

In May 2016, Plaintiff applied for FMLA leave for a "medical procedure." (*Id.* at 18.) The Human Resources ("HR") representative commented to Plaintiff, "Boy, you people in Undergraduate Biology sure do get sick a lot." (*Id.*) Plaintiff "encountered numerous difficulties with filing [the FMLA] paper work, getting information, and getting [approval]". (*Id.*) At one point, HR refused to accept a letter from Plaintiff's doctor because of an issue with the letterhead, but, after Plaintiff pushed back, HR accepted it. (*Id.*)

### G. Plaintiff's 2015-2016 Performance Evaluation

On June 15, 2016, Plaintiff received her annual evaluation[3] for 2015-2016 and noticed that she received inferior scores, despite complimentary comments from Bernero. (*Id.* at 11.) Before Plaintiff received her evaluation, Gergen had changed her evaluation scores, as well as those of Wilkinson and another colleague, Desiree de Figueroa.[4] (*Id.* at 12–13.) Gergen referred to Plaintiff, Wilkinson, and de Figueroa as a "cabal." (*Id.* at 12.) When questioned about the changes, Gergen stated that "no one should get all fives." (*Id.*) However, the changes made by Gergen were rejected by Labor Relations due to a technicality—Gergen had changed the scores only after Plaintiff had signed the initial evaluation. (*Id.* at 13.) Gergen declared that now that "he had 'a better understanding of the rules[,]' he would be sure to get" the next evaluation before Plaintiff could sign it. (*Id.*)

### H. 2017 Classification and Compensation Review

On February 10, 2017, Gergen requested that de Figueroa, Wilkinson, and Plaintiff put together a list of Stony Brook employees with similar duties and experience as each of them. (*Id.* at 16.) On March 1, 2017, Gergen informed Plaintiff that he had gotten permission from the dean to proceed with a classification and compensation review. (*Id.* at 16–17.) On March 6, 2017, Plaintiff submitted information that showed that people with similar responsibilities to hers were paid at least a grade higher. (*Id.* at 17.) On July 17, 2017, Plaintiff was informed that all raises were on hold at the University. (*Id.*) However, a Biology department colleague, Virgil Acuff, had

---

[3] Performance evaluations are made by the direct supervisor, but the faculty is encouraged to comment on the person's work, which may be incorporated by the direct supervisor in the evaluation. (*Id.* at 11.)

[4] De Figueroa filed an EEOC complaint in July 2015. (*Id.* at 12.)

retired from the department, thus freeing up funds that could have been used for Plaintiff's raise. (*Id.*)

## I.      Plaintiff's 2016-2017 Performance Evaluation

On June 19, 2017, Plaintiff received her 2016-2017 performance evaluation. (*Id.* at 13.) Plaintiff's work performance rating was downgraded again in her 2017 annual evaluation, which also contained disparaging comments about Plaintiff's work. (*Id.*) Plaintiff's supervisor, Bernero, informed Plaintiff that she (Bernero) could not change the scores because she was worried about her own evaluation with Gergen. (*Id.*) Bernero's statement that she could not change the scores was contrary to the evaluation guidelines, which required that the direct supervisor have the final say over the employee's annual evaluation scores. (*Id.* at 14.) Bernero also told Plaintiff that Gergen, O'Neal, and she met to review the evaluations and that no other faculty members were invited. (*Id.*) Plaintiff, de Figueroa, and Wilkinson made a complaint to the union about O'Neal's presence at the meeting to discuss annual evaluations, but the union denied the grievance, despite the fact that Gergen admitted to the union that O'Neal had attended the meeting. (*Id.* at 14−15.)

In her 2016-2017 annual evaluation, Plaintiff received a relatively low score for "Reliability," even though she had not been late once that year, had over 70 unused sick days, and attended every meeting except for one. (*Id.* at 19.) The comments included "[c]ould be more helpful to others," despite the fact that Plaintiff took on the additional responsibility of training new assistant curators. (*Id.*) Despite Gergen's statement in 2016 that "no one should get all fives," a "young" staff member in Plaintiff's Department, Alex Scavelli, received a near-perfect evaluation with only one score of four (out of five). (*Id.* at 12, 19.)

**J.      Plaintiff's 2017 FMLA Application**

Plaintiff "had to" apply for FMLA leave in June 2017.  (*Id.* at 19.)[5]  But she was hesitant to apply because she thought that her earlier FMLA leaves angered Gergen and resulted in her subsequent lower annual evaluation scores.  (*Id.*)  On July 25, 2017, Plaintiff reported Gergen's "attitude" to the OIDE and was told on September 21, 2017 that her claims were unfounded.  (*Id.* at 20.)

In November 2017, Gergen directed Bernero to notify the staff if Plaintiff or other professional staff would be out of work, because he felt that people needed to know.  (*Id.*)  De Figueroa and Plaintiff protested that for people with FMLA, this exposed people to censure, and discouraged people from taking time off, and that such notice was unnecessary.  (*Id.*)  No other faculty groups besides O'Neal's group had such an absence-reporting requirement.  (*Id.*)

**K.      Grid Assignments**

On August 11, 2017, Plaintiff was given a document called the "Grid," which listed all of the assistant curators and assigned them times when they had to be in a "fundamental labs" room, G20.  (*Id.* at 21.)  The Grid only took into consideration the schedule of the fundamental labs, and not the "upper division labs."  (*Id.*)  Because the younger Biology Department employees were not assigned to the upper division labs, the implementation of the Grid did not affect their work.  (*Id.*)  However, the older assistant curators were also assigned to the upper division labs, so they had to "shuttle from room to room."  (*Id.*)  The Grid conflicted with Plaintiff's assignments at the upper division labs and did not allow her enough time to complete certain tasks.  (*Id.* at 21−22.)  Despite Plaintiff's email to Gergen detailing these conflicts, the Grid was implemented.  (*Id.* at 22.)

---

[5] Notably, Plaintiff never indicates in the SAC whether she, in fact, applied for, or was granted, FMLA leave in June 2017.

Additionally, only the younger employees were given permission to use the desks in room G20. (*Id.*) Plaintiff and Wilkinson were forced to share the only "public use" desk in G20, making it impossible to do paperwork. (*Id.*)

In August 2017, O'Neal announced, with Gergen's permission, that the younger Biology Department employees were being allowed access to a room used by the faculty of the fundamental labs. (*Id.* at 23.) The older employees were not included and, as a result, they were segregated from the younger employees and denied the opportunity to socialize with the faculty "who have a critical role in evaluations." (*Id.*)

### L.        Biology Department's New Hire

In July 2018, one of the employees assigned to the day shift at the fundamental labs left the job. Gergen decided not to fill her position, but to instead hire someone to assist Christina Giordano, a younger staff member, during the night shift. (*Id.* at 23.) There were more classes during the day than at night and Plaintiff worked the day shift. (*Id.*)

### M.        Change of Plaintiff's Hours

On July 3, 2018, Gergen indicated that starting in September 2018, he would change Plaintiff's hours from days to nights.[6] (*Id.* at 11.) Gergen asked Plaintiff's younger colleague, Giordana, to relay the news. (*Id.*)

### N.        Defendant O'Neal's Alleged Refusal to Communicate

On August 15, 2018, Bernero informed the department's professional staff, including Plaintiff, that O'Neal was angry and did not want to interact with the staff. (*Id.* at 24.) Bernero advised the staff to send emails to her and that she would forward the information to O'Neal. (*Id.*)

---

[6] Plaintiff acknowledges that as of March 2019, her work hours had not been changed. (Plaintiff's Opposition Brief ("Pl.'s Br."), Dkt. 24, at 5.)

This led to a communication breakdown when Bernero was off from work on August 25, 2018. (*Id.* at 24−25.)  The decision not to communicate with the professional staff was reached at a meeting between Gergen and O'Neal.  (*Id.* at 25−26.)  O'Neal insisted that he would not contact the staff in any way due to the instant lawsuit and O'Neal's subordinates followed suit.  (*Id.* at 25.) O'Neal's refusal to communicate with staff interfered with Plaintiff's effectiveness at work.  (*Id.* at 25−26.)

### O. Elimination of Plaintiff's Safety Talk Duties

Prior to the fall of 2018, Plaintiff used to give a short talk to teaching assistants regarding the use and safety of equipment in the labs.  (*Id.* at 26.)  However, since the fall of 2018, Plaintiff has not been giving these talks, which led to "a steep increase" in equipment breakage, mishandled waste, and classroom disarray, creating more work for Plaintiff.  (*Id.*)

## PROCEDURAL HISTORY

Plaintiff filed a charge under the ADEA with the Equal Employment Opportunity Commission ("EEOC") on September 29, 2017, and received a Right to Sue letter on April 24, 2018.  (*Id.* at 28; Dkt. 20-3.)  Plaintiff filed suit on July 20, 2018.[7]  (*See* Complaint, Dkt. 1.)  On July 26, 2018, Plaintiff filed an amended complaint with additional factual allegations.  (*See* Amended Complaint, Dkt. 4.)  On August 14, 2018, Defendants requested a pre-motion conference in connection with their proposed motion to dismiss Plaintiff's Amended Complaint for lack of jurisdiction and failure to state a claim.  (*See* Defendants' Motion for Pre-Motion Conference, Dkt. 9.)  On September 14, 2018, Plaintiff again amended her complaint, without first seeking leave to amend.  (*See* SAC, Dkt. 13.)  Defendants filed a second pre-motion conference request on

---

[7] This case was originally assigned to the Honorable Joanna Seybert.  (*See* Nov. 6, 2018 Order, Dkt. 16.)

September 18, 2018. (*See* Defendants' Motion for Pre-Motion Conference, Dkt. 14.) On November 14, 2018, Judge Seybert held a pre-motion conference with the parties and referred this case to the Mediation Advocacy Program. (*See* Nov. 14, 2018 Minute Entry.) The parties attended a mediation session on January 16, 2019 (*see* Dec. 26, 2018 Selection of Mediator), but mediation was unsuccessful (*see* Jan. 24, 2019 Report of Mediation Unsettled). In light of the failed mediation, Defendants renewed their motion to dismiss on January 24, 2019. (Defendants' Motion to Dismiss, Dkt. 18.) On March 27, 2019, Defendants' motion was fully briefed. (*See* Defendants' Reply, Dkt. 26.) On March 28, 2019, this case was reassigned from Judge Seybert to the undersigned. (*See* Mar. 28, 2018 Order Reassigning Case.)

## STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). The "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted).

Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted); *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013). In addressing the sufficiency of a complaint, courts are required to accept the well-pleaded factual allegations contained within the complaint as true, *see Building Indus. Elec. Contractors Ass'n v. City of New*

*York*, 678 F.3d 184, 187 (2d Cir. 2012), but "need not credit conclusory statements unsupported by assertions of facts[,] or legal conclusions . . . presented as factual allegations," *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 404 (S.D.N.Y. 2001) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Additionally, a court "need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *Id.* at 405–06 (citing *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995)).

At the pleadings stage, a court must limit its inquiry to the facts alleged in the complaint, the documents attached to the complaint or incorporated therein by reference, and "documents that, while not explicitly incorporated into the complaint, are 'integral' to [the] plaintiff's claims and were relied upon in drafting the complaint." *Id.* at 404 (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 44 (2d Cir. 1991)). Thus, in employment discrimination cases, courts may consider filings with state administrative agencies or the EEOC to the extent that a complaint necessarily rests upon them. *See Littlejohn v. City of New York*, 795 F.3d 297, 305 n.3 (2d Cir. 2015) ("'[I]t is proper for this court to consider the plaintiff's relevant filings with the EEOC' and other documents related to the plaintiff's claim . . . so long as those filings are . . . 'integral to' and 'solely relied' upon by the complaint." (brackets omitted) (quoting *Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 565–66 (2d Cir. 2006))).

## DISCUSSION

Plaintiff's SAC asserts the following claims: (1) discrimination, hostile work environment, and retaliation in violation of the ADEA, ADA, and Rehabilitation Act; (2) interference and retaliation in violation of the FMLA; (3) due process violations under § 1983; and (4)

discrimination, hostile work environment, and retaliation in violation of the NYSHRL.[8] (*See* SAC, Dkt. 13, at 3.) Each of Plaintiff's claims are asserted against the Individual Defendants in both their official and individual capacities, as well as against the University and New York State. (*Id.* at 1.) Defendants move to dismiss all of Plaintiff's claims.[9] (*See generally* Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint ("Defs.' Br."), Dkt. 20-5.)

## I. Eleventh Amendment Sovereign Immunity[10]

The Eleventh Amendment of the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or

---

[8] Because Plaintiff is *pro se*, the Court construes her submissions liberally and interprets them to "raise the strongest arguments that they suggest." *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotations and citation omitted).

[9] Though Defendants have expressly moved to dismiss all of Plaintiff's claims, Plaintiff's opposition brief does not address the FMLA interference claim, the ADEA discrimination claim, and the hostile work environment claims. (*See* Pl.'s Br., Dkt. 24.) "[The] Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed. Application of this proposition is, however, tempered by this Court's discretion." *Lipton v. Cty. of Orange, NY*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004). Considering Plaintiff's *pro se* status, the Court will not deem her claims abandoned. *Rosen v. N.Y.C. Dep't of Educ.*, No. 18-CV-6670 (AT), 2019 WL 4039958, at *3 n.4 (S.D.N.Y. Aug. 27, 2019) (declining to deem *pro se* plaintiff's claims abandoned). *But see Uddoh v. United Healthcare*, No. 16-CV-1002 (BMC) (LB), 2017 WL 563973, at *5 (E.D.N.Y. Feb. 10, 2017) (holding that *pro se* plaintiffs abandoned their claim where they failed to respond to defendant's arguments that the claim should be dismissed).

[10] Whether a state's sovereign immunity under the Eleventh Amendment presents a question of subject matter jurisdiction is an open question in the Supreme Court and the Second Circuit. *See Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 391 (1998); *Carver v. Nassau Cty. Interim Fin. Auth.*, 730 F.3d 150, 156 (2d Cir. 2013) (leaving open "whether the claim of sovereign immunity constitutes a true issue of subject matter jurisdiction or is more appropriately viewed as an affirmative defense"). In light of this uncertainty, the Court first addresses the sovereign immunity defenses raised by Defendants. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) ("[S]ubject-matter jurisdiction necessarily precedes a ruling on the merits.").

Subjects of any Foreign State." U.S. Const. Amend. XI. "Although not clear from the terms of the [Eleventh] [A]mendment, the Supreme Court has interpreted this language to bar suit against a state by its own citizens." *Islander E. Pipeline Co., LLC. v. Conn. Dep't of Envt'l Prot.*, 482 F.3d 79, 88–89 (2d Cir. 2006); *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996) (citing *Hans v. Louisiana*, 134 U.S. 1 (1890)). New York's sovereign immunity extends to the State University of New York system, *see Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990), as well as, under most circumstances, to state officials sued in their official capacities, *see Stinson v. City Univ. of N.Y.*, No. 17-CV-3949 (KBF), 2018 WL 2727886, at *5 (citing *Clissuras v. City Univ. of N.Y.*, 359 F.3d 79, 82 (2d Cir. 2004); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101–02 (1984)). Accordingly, absent an express waiver of sovereign immunity or a clear abrogation of that immunity by Congress, the Eleventh Amendment generally bars Plaintiff from suing New York State, the University, and state officials, such as Gergen and O'Neal, in their official capacities, in federal court for legal and equitable relief. *See Davis v. Proud*, 2 F. Supp. 3d 460, 476–77 (E.D.N.Y. 2014).

### A. Claims Against New York State and the University

#### 1. Rehabilitation Act Claims

In enacting § 504 of the Rehabilitation Act, Congress expressed its clear intent "to condition [a state's] acceptance of federal funds on [the] state's waiver of its Eleventh Amendment immunity." *Garcia v. State Univ. of N.Y. Health Sci. Ctr. of Brooklyn*, 280 F.3d 98, 113 (2d Cir. 2001); *see also* 42 U.S.C. § 2000d-7 ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act . . . ."). Courts in this Circuit have held that New York State's continued receipt of federal funds under § 504 after *Garcia* "constitutes a knowing waiver of sovereign

immunity." *Gentleman v. State Univ. of N.Y.—Stony Brook*, No. 16-CV-02012 (ADS) (AKT), 2016 WL 6892151, at *5 (E.D.N.Y. Nov. 21, 2016) (quoting *Marino v. City Univ. of N.Y.*, 18 F. Supp. 3d 320, 331 (E.D.N.Y. 2014)). Thus, Plaintiff's claims under the Rehabilitation Act against New York State and the University are not barred by sovereign immunity.[11]

### 2. FMLA, ADA, ADEA, § 1983, NYSHRL

By contrast, Supreme Court and Second Circuit precedents make clear that Congress has not abrogated state sovereign immunity by enacting the "self-care" provision[12] of the FMLA, Title I of the ADA,[13] the ADEA, or Section 1983. *See Coleman*, 566 U.S. at 37 ("Standing alone, the self-care provision [of the FMLA] is not a valid abrogation of the States' immunity from suit."); *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001) (holding that Congress did not abrogate the states' sovereign immunity against employment discrimination claims arising under

---

[11] Since Plaintiff is able to assert her Rehabilitation Act claims against New York State and the University, there is no need for Plaintiff to also assert these claims against the Individual Defendants in their official capacities. *See Hallett v. N.Y. State Dep't of Corr. Servs.*, 109 F. Supp. 2d 190, 200 (S.D.N.Y. 2000) ("Because plaintiff is able to assert [her] . . . Rehabilitation Act claims against [the state entities] directly, [the court] find[s] that there is no justification for allowing plaintiff to also assert . . . Rehabilitation Act claims against individual defendants in their official capacities."); *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 288 (2d Cir. 2003) ("The real party in interest in an official-capacity suit is the government entity."). Accordingly, Plaintiff's Rehabilitation Act claims against Defendants Gergen and O'Neal in their official capacities are dismissed.

[12] In *Coleman*, the Supreme Court distinguished the "family-care provisions" of the FMLA, *see* 29 U.S.C. § 2612(a)(1)(A)–(C), from the "self-care provision," *see* 29 U.S.C. § 2612(a)(1)(D). *See Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30, 34 (2012). Pursuant to the self-care provision, an employee may take FMLA leave for "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).

[13] Plaintiff's claims cannot be construed as being brought pursuant to Title II of the ADA, as Title II does not cover employment discrimination claims. *See Mary Jo C. v. N.Y. State and Local Ret. Sys.*, 707 F.3d 144, 171 (2d Cir. 2013) (stating that the ADA "unambiguously limits employment discrimination claims to Title I" and that a "public employee may not bring a Title II claim against his or her employer").

Title I of the ADA); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 91 (2000) (holding that the ADEA did not validly abrogate the States' sovereign immunity); *Dube*, 900 F.2d at 594 ("[I]t is well settled that 42 U.S.C. § 1983 does not constitute an exercise of [Congress's] authority [to abrogate sovereign immunity].").  Neither has New York State waived its Eleventh Amendment immunity and consented to suit in federal court under the NYSHRL.  *See Quadir v. N.Y. State Dep't of Labor*, 39 F. Supp. 3d 528, 537–38 (S.D.N.Y. 2014).

Accordingly, Plaintiff's claims under the FMLA[14], ADA, ADEA, § 1983, and NYSHRL against New York State and the University are barred by sovereign immunity and must be dismissed.

### B.     Claims Against the Individual Defendants in Their Official Capacity

Plaintiff is also barred under the Eleventh Amendment from seeking monetary relief against the Individual Defendants in their official capacities.  *See Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003) ("The Eleventh Amendment bars the award of money damages against state officials in their official capacities.").  But, under *Ex parte Young*, 209 U.S. 123 (1908), "a plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for prospective, injunctive relief from violations of federal law."  *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007) (internal quotations and citation omitted).  The *Ex parte Young* exception "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes."  *Va. Office for Prot.*

---

[14] Based on the allegations in the SAC, the Court infers that Plaintiff's FMLA claims are premised solely on self-care leave requests under the FMLA.  (*See* SAC, Dkt. 13, at 17 ("I first filed for protection under FMLA in January of 2011 to handle repetitive doctor's appointments and absences for a serious illness."; *id.* at 18 ("By late May 2016, it was clear that I would need to take a solid block of time off to have a medical procedure . . . .").)

& *Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (internal citation omitted). Before applying this exception, however, a court is "specifically required . . . to examine whether there exists an ongoing violation of federal law." *Pierre v. N.Y. State Dep't of Corr. Servs.*, No. 05-CV-00275 (RJS), 2009 WL 1583475, at *18 (S.D.N.Y. June 1, 2009) (internal quotations and citation omitted). Where a plaintiff alleges "only discrete acts of past discrimination and retaliation," merely characterizing the request for relief as prospective will not suffice to invoke the *Ex parte Young* doctrine. *Id.* (internal quotations and citation omitted).

  1. <u>Prospective Injunctive Relief Only for FMLA, ADA, ADEA,</u>

    <u>and § 1983 Claims</u>

   Applying these standards, the Court finds that sovereign immunity does not bar Plaintiff from asserting claims for prospective injunctive relief against Defendants Gergen and O'Neal in their official capacities with respect to her claims of discrimination, retaliation and hostile work environment under the FMLA, ADA, ADEA, and § 1983. Plaintiff continues to be employed by Defendants, and she alleges that O'Neal continues to send her supervisor emails complaining that Plaintiff is incompetent and insubordinate. (SAC, Dkt. 13, at 9−10.) Plaintiff also alleges that she continues to be treated differently than the younger employees. (*Id.* at 22−23.) Liberally construed, the SAC also alleges that Gergen and O'Neal have taken actions since this case began that could constitute retaliation against Plaintiff for filing this case. (*See id.* at 11 (alleging that Gergen threatened to change Plaintiff's hours from days to nights); *id.* at 24−25 (alleging that O'Neal refused to interact with Plaintiff due to the lawsuit).)[15] Plaintiff also alleges that "[i]t is

---

[15] Importantly, although these alleged acts of retaliation are sufficient, at this stage of the analysis, to prevent Plaintiff from being barred by sovereign immunity from seeking prospective injunctive relief from the Individual Defendants, as discussed *infra*, the Court ultimately finds that they are insufficient to allege an adverse employment action for purposes of Plaintiff's retaliation claims under the ADA/Rehabilitation Act and the ADEA.

clear that [Gergen] will continue to harass, intimidate[,] and retaliate against [her,] . . . continue to block [her] attempts to increase [her earnings] . . . ." (*Id.* at 27–28.) As relief, Plaintiff seeks an injunction "preventing defendant[16] from engaging in any harassing and/or retaliatory activities" and "tak[ing] away" from Defendants "[t]he keys to [her] office and workspace." (*Id.*) Such relief is properly characterized as prospective and may be sought against the Individual Defendants in their official capacities pursuant to *Ex parte Young*, to the extent this relief would remedy the ongoing violations with respect to any FMLA, ADEA, ADA, or § 1983 claim that Plaintiff sufficiently alleges. *See State Emps. Bargaining Agent Coalition*, 494 F.3d at 98 ("The prohibition against retaliation sought by plaintiffs . . . would prevent this alleged ongoing injury from occurring again in the future. Thus, sovereign immunity does not bar the . . . forms of injunctive relief sought by plaintiffs.").

### 2. NYSHRL Claims Barred by Sovereign Immunity

Finally, Plaintiff's claims against the Individual Defendants in their official capacities under the NYSHRL fail, regardless of the relief being sought, because "the Eleventh Amendment also bars suits in federal courts seeking relief, whether prospective or retroactive, against . . . state officials for their alleged violation of state law." *DeMartino v. New York*, No. 12-CV-3319 (SJF) (AKT), 2013 WL 3226789, at *6 (E.D.N.Y. June 24, 2013), *aff'd*, 586 F. App'x 68 (2d Cir. 2014) (summary order).

## II. Individual Liability

There is no individual liability under the ADEA, ADA, or Rehabilitation Act. *See Darcy v. Lippman*, 356 F. App'x 434, 437 (2d Cir. 2009) (summary order) ("[T]he ADA and ADEA . . .

---

[16] Plaintiff's use of the singular term "defendant" is ambiguous, but for the purposes of its sovereign immunity analysis, the Court liberally construes Plaintiff's SAC to seek prospective injunctive relief as to both of the Individual Defendants.

do not provide for actions against individual supervisors."); *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001) ("[N]either Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials.").  Accordingly, to the extent that Plaintiff asserts ADEA, ADA, or Rehabilitation Act claims against Gergen and O'Neal in their individual capacities, the Court dismisses those claims.

*      *      *

In sum, the following claims are not barred by sovereign immunity and will be considered on their merits:

(1) Plaintiff's Rehabilitation Act claims for discrimination, hostile work environment, and retaliation against New York State and the University;

(2) Plaintiff's claims against the Individual Defendants in their official capacities alleging FMLA retaliation; ADA discrimination, hostile work environment, and retaliation; ADEA discrimination, hostile work environment, and retaliation; and § 1983 violations—but all limited to prospective injunctive relief; and

(3) Plaintiff's FMLA, § 1983, and state law claims against the Individual Defendants in their individual capacities.

Plaintiff's other FMLA, ADA, and ADEA claims, and all of her NYSHRL claims, are barred by sovereign immunity and are dismissed.  Having addressed these threshold issues, the Court now considers the sufficiency of Plaintiff's non-barred claims.

## III. Plaintiff's FMLA Claims[17]

"The FMLA provides generally that a covered employer is required to grant an eligible employee up to a total of 12 weeks['] leave during any 12-month period for personal or family needs indicated in the Act."[18] *Coutard v. Mun. Credit Union*, 848 F.3d 102, 108 (2d Cir. 2017)

---

[17] The standard statute of limitations for interference and retaliation claims under the FMLA is two years. *See* 29 U.S.C. § 2617(c)(1) ("[A]n action may be brought under this section not later than [two] years after the date of the last event constituting the alleged violation for which the action is brought."). A three-year statute of limitations applies, however, if a plaintiff alleges "willful" violations of the FMLA. *See id.* § 2617(c)(2) ("In the case of such action brought for a willful violation of [§ 2615], such action may be brought within [three] years of the date of the last event constituting the alleged violation for which such action is brought."). An FMLA violation is willful if an employer either "knew or showed reckless disregard" for whether its conduct violated the FMLA. *Porter v. N.Y. Univ. Sch. of Law*, 392 F.3d 530, 531 (2d Cir. 2004) (per curiam). Plaintiff does not allege that she was denied any FMLA benefits. Thus, the standard two-year statute of limitations is applicable to Plaintiff's FMLA interference claim. This means that Plaintiff's FMLA interference claim may only be based on allegations of interference that occurred after July 20, 2016.

As to Plaintiff's FMLA retaliation claims, however, the three-year statute of limitations should apply. In a recent summary order, the Second Circuit stated that "retaliating against an employee for exercising FMLA rights is almost by definition a 'willful' violation." *Offor v. Mercy Med. Ctr.*, 676 F. App'x 51, 54 n.2 (2d Cir. 2017) (summary order). Though this non-precedential decision does not definitively resolve the issue, the Court finds that the three-year statute of limitations is appropriate in this case. Accepting Plaintiff's allegations as true for purposes of this motion to dismiss, the Court notes that the actions of Individual Defendants, including negatively altering her performance evaluations in 2016 and 2017 (SAC, Dkt. 13, 11−15), altering her job responsibilities (*id.* at 21−22), and denying her a classification and compensation review (*id.* at 16−17), if taken under circumstances giving rise to an inference of retaliation, would exhibit reckless disregard of their obligations under the FMLA. The Court finds that the FMLA's three-year statute of limitations applies and Plaintiff's FMLA retaliation claim may be based on allegations that occurred after July 20, 2015.

[18] For purposes of the FMLA, a covered employer is "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year." 29 U.S.C. § 2611(4)(A)(i). As relevant here, an eligible employee is an employee who has been employed "for at least 12 months by the employer . . . and for at least 1,250 hours of service with [that] employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). The parties do not dispute that the University was a covered employer and Plaintiff was an eligible employee during the time period relevant to this action.

(citing 29 U.S.C. § 2612(a)). Under the self-care provision of the FMLA, eligible employees are statutorily entitled to 12 work-weeks of leave during any 12-month period for, *inter alia*, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).

In order to ensure that eligible employees are not deprived of their statutory rights, the FMLA makes it unlawful for an employer (1) "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" established by the FMLA, or (2) "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a). Therefore, employers may not "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions[,] or disciplinary actions." 29 C.F.R. § 825.220(c). Employers are also prohibited from discriminating against any employee for filing any charge or instituting any proceeding under or related to the FMLA. *See* 29 U.S.C. § 2615(b)(1). In the Second Circuit, these prohibitions give rise to two distinct types of FMLA claims: interference claims and retaliation claims. *See Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004) (per curiam). Plaintiff has asserted both types of FMLA claims in this case. (*See* SAC, Dkt. 13, at 3.)

In light of the Court's sovereign immunity analysis, *supra*, Plaintiff may not assert either of her FMLA claims against Defendants New York State or the University and may only assert her FMLA retaliation claim against the Individual Defendants in their official capacities for prospective injunctive relief. Plaintiff, however, may assert both of her FMLA claims against the Individual Defendants in their individual capacities.[19]

---

[19] The Court notes that "an individual can face personal liability under the FMLA under certain circumstances." *Diby v. Kepco Inc.*, No. 16-CV-583 (KAM) (LB), 2016 WL 5879595, at *3 (E.D.N.Y. Oct. 7, 2016). "Personal liability under the FMLA is appropriate[] only if the

## A.     FMLA Interference

In the Second Circuit, a plaintiff must plead the following elements to state a claim of interference under the FMLA: "1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA." *Graziadio*, 817 F.3d at 424. The Court finds that Plaintiff's FMLA interference claim fails on the fifth prong.

The fifth element, *i.e.*, that the employee was denied FMLA leave, may be satisfied either by a formal denial or via a "discouragement theory" of denial. Under this theory, a plaintiff is denied benefits under the FMLA if the plaintiff "tried to assert her FMLA rights and was thereafter discouraged from taking FMLA leave." *Reilly v. Revlon, Inc.*, 620 F. Supp 524, 535 (S.D.N.Y. 2009). Indeed, a plaintiff may plausibly allege the fifth element of an interference claim if her allegations establish that "the employer's purported acts of discouragement would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise . . . her FMLA rights." *Id.* at 535 (citing *Golden v. N.Y.C. Dep't of Envt'l Prot.*, No. 06-CV-1587 (DLC), 2007

---

individual defendant is an 'employer' within the definition of the statute." *Id.* (citing *Graziadio v. Culinary Inst. Of Am.*, 817 F.3d 415, 422 (2d Cir. 2016)). The Second Circuit applies the "economic-reality test," used in Fair Labor Standards Act cases, to determine whether an individual is an employer under the FMLA. *Graziadio*, 817 F.3d at 422. "In the FMLA context, courts assessing the economic reality of an employment relationship have construed this test as asking essentially whether the putative employer controlled in whole or in part plaintiff's rights under the FMLA." *Id.* at 423 (internal quotations and citation omitted). Defendants do not argue that the Individual Defendants cannot be held individually liable under the FMLA (*see* Defs.' Br., Dkt. 20-5, at 11), and the Court finds that Plaintiff has sufficiently alleged that Defendants controlled her rights under the FMLA for purposes of her individual liability claims against Gergen and O'Neal. *See Ziccarelli v. N.Y. Univ. Hosps. Ctr.*, 247 F. Supp. 3d 438, 446 (S.D.N.Y. 2017) ("[T]o survive a motion to dismiss, [the p]laintiff . . . must simply plead that the proposed [individual defendant employers] had substantial control over the aspects of employment alleged to have been violated." (internal quotation and citation omitted)).

WL 4258241, at *3 (S.D.N.Y. Dec. 3, 2007)); *see also Santiago v. Dep't of Transp.*, 50 F. Supp. 3d 136, 144 (D. Conn. 2014).

Here, there is no allegation that Plaintiff was formally denied her FMLA benefits. Indeed, Plaintiff applied for, and was granted, FMLA leave in May 2016. (SAC, Dkt. 13, at 18−19.) At most, Plaintiff suggests that when she "had to" file for FMLA leave in June 2017, she feared that "Gergen would be able to use the leaves as an excuse to force [her] to resign or professionally hurt [her] in some other way." (*Id.* at 19.) Yet, the SAC does not indicate whether Plaintiff was, in fact, dissuaded from applying for FMLA leave in June 2017. Plaintiff otherwise alleges that she "find[s herself] reluctant to renew [her] FMLA." (*Id.* at 20.)

These allegations are insufficient to allege the denial of FMLA benefits even under a "discouragement theory." Despite claiming that she feared Gergen's use of her FMLA leaves against her in the future, Plaintiff does not allege that she was actually dissuaded from seeking FMLA leave in June 2017 or at any other time. Furthermore, the single statement made by Gergen in 2011 upon which Plaintiff based her fear—*i.e.*, people who applied for FMLA were "screwing the department"—is insufficient to demonstrate that "a similarly situated employee of ordinary resolve" would be discouraged from "attempting to exercise . . . her FMLA rights." *Reilly*, 620 F. Supp. 2d at 535.

Accordingly, Plaintiff's FMLA interference claim against the Individual Defendants is dismissed.

**B.      FMLA Retaliation**

A plaintiff may bring FMLA retaliation claims for violations of both 29 U.S.C. §§ 2615(a)(1) and 2615(a)(2). *See Woods v. START Treatment & Recovery Ctrs., Inc*., 864 F.3d 158, 167 (2d Cir. 2017); *see also* 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer

to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]."); 29 U.S.C. § 2615(a)(2) ("It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]."). FMLA retaliation claims are analyzed under the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[20] *See Graziadio*, 817 F.3d at 429.

> To establish a *prima facia* case of FMLA retaliation, a plaintiff must establish that (1) [s]he exercised rights protected under the FMLA; (2) [s]he was qualified for [her] position, (3) [s]he suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.

*Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012) (internal quotations and citations omitted). "At the motion to dismiss stage, however, a plaintiff need not plead specific facts establishing a prima facie case of discrimination. Instead, a plaintiff need only plead facts sufficient to state a claim to relief that is plausible on its face." *Horsting v. St. John's Riverside Hosp.*, No. 17-CV-3230 (CS), 2018 WL 1918617, at *5 (S.D.N.Y. Apr. 18, 2018) (alterations and citations omitted).

"For purposes of FMLA retaliation claims, an adverse employment action is 'any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising h[er] legal rights.'" *Smith v. N. Shore-Long Island Jewish Health Sys.*, 286 F. Supp. 3d 501, 512 (E.D.N.Y. 2018) (quoting *Millea v. Metro–N. R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011) (alteration in original). "'[P]etty slights, minor annoyances, and simple lack of good manners will

---

[20] "Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a *prima facie* case of discrimination[.]" *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014). The burden then shifts to the defendant "to proffer a legitimate non-discriminatory reason for its actions." *Id.* The burden then shifts back to "the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination." *Id.*

not' give rise to actionable retaliation claims." *Millea*, 658 F.3d at 165 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).[21] "In determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Smith*, 286 F. Supp. 3d at 512 (quoting *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010)).

As to the fourth element, a plaintiff can raise an inference of retaliatory intent "by showing that the protected activity was closely followed in time by the adverse employment action." *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001) (internal quotation marks, brackets, and citation omitted). There is no firm outer limit to the temporal proximity required, but most courts in the Second Circuit have held that a lapse of time beyond two or three months will break the causal inference. *See Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 503–04 (S.D.N.Y. 2010) (collecting cases).

Here, there is no dispute that Plaintiff is qualified for the position that she holds—the second element of a *prima facie* FMLA retaliation claim. Further, Plaintiff exercised her rights under the FMLA when she applied for FMLA leave in May 2016, thereby satisfying the first element. *See* 29 U.S.C. § 2615(b)(1). With respect to the third element, Plaintiff has alleged at least one adverse employment action, *i.e.*, Gergen lowering Plaintiff's performance evaluation

---

[21] In *Millea v. Metro–N. R. Co.*, the Second Circuit held that the adverse employment action standard for Title VII retaliation claims applies to FMLA retaliation claims. 658 F.3d at 164. "Therefore, the Court may rely on Title VII retaliation cases in analyzing adverse employment actions in the FMLA retaliation context." *Smith*, 286 F. Supp. 3d at 512 n.7 (E.D.N.Y. 2018). "The standard for an adverse employment action in retaliation claims is considerably broader than the standard for discrimination claims under Title VII." *Jaeger v. N. Babylon Union Free Sch. Dist.*, 191 F. Supp. 3d 215, 234 (E.D.N.Y. 2016) (internal quotations and citation omitted).

score in June 2016. (SAC, Dkt. 13, at 11−12.)[22] *Taylor v. N.Y.C. Dep't of Educ.*, No. 11-CV-3582 (JG), 2012 WL 5989874, at \*10 (E.D.N.Y. Nov. 30, 2012) ("The courts in this Circuit have held that negative performance reviews, standing alone, can be considered an adverse employment action for purposes of a retaliation claim." (internal quotation marks and citations omitted)).

The Court also finds that Plaintiff has plausibly alleged that Gergen's decision to downgrade Plaintiff's performance evaluation in 2016 occurred under circumstances giving rise to a reasonable inference of retaliatory intent. Plaintiff applied for FMLA leave in May 2016 and received the evaluation on June 15, 2016. (SAC, Dkt. 13, at 11, 18.) This "very close" temporal proximity alone is enough to allow Plaintiff to overcome Defendants' motion to dismiss. *See Lambert v. Trump Int'l Hotel & Tower*, 304 F. Supp. 3d 405, 423 (S.D.N.Y. 2013) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). The other adverse employment actions that followed the downgrading of Plaintiff's annual evaluation can also support the retaliation claim. *See Hagan v. City of New York*, 39 F. Supp. 3d 481, 503 (S.D.N.Y. 2014) ("[W]here protected activity is followed by minor adverse adjustments in the terms of employment, it becomes more plausible that an ensuing adverse employment action was caused by the protected activity.").

Therefore, Plaintiff's FMLA retaliation claim for prospective injunctive relief can proceed.

## IV. Claims Under the ADA and Rehabilitation Act

Title I of the ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of

---

[22] Even though the changes did not take effect due to a technicality—Gergen changed the scores after Plaintiff signed the original evaluation (SAC, Dkt. 13, at 13), the Court finds that such action could still "dissuade a reasonable worker," because the effect or lack thereof does not change the supervisor's intent. Furthermore, according to the SAC, upon learning that he was too late to change Plaintiff's and her co-workers' scores for that year, Gergen vowed to "get" the next year's evaluation, and, in fact, Plaintiff's evaluation scores the following year were again lowered. (*Id.*)

employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Similarly, the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Claims of disability discrimination brought pursuant to Title I of the ADA and the Rehabilitation Act are analyzed under the same standards.[23] *See* 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under Title I of the Americans with Disabilities Act of 1990 . . . ."); *see also Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016). Accordingly, when claims are brought together under the ADA and Rehabilitation Act, the elements of the claims "may be treated identically." *Hilton v. Wright*, 673 F.3d 120, 128 n.7 (2d Cir. 2012).

In light of the Court's sovereign immunity analysis *supra*, Plaintiff may assert claims of discrimination, hostile work environment, and retaliation under the Rehabilitation Act against the University and New York State. Plaintiff may also assert claims for prospective injunctive relief against the Individual Defendants in their official capacities for hostile work environment, discrimination, and retaliation in violation of the ADA.

---

[23] Notably, the Second Circuit recently held that, despite the statutes' seemingly different language, "the Rehabilitation Act incorporates the ADA's causation standard for employment discrimination claims." *Natofsky v. City of New York*, 921 F.3d 337, 346 (2d Cir. 2019). "[T]he ADA requires a but-for causation standard." *Id.* at 349.

## A.     Timeliness

A plaintiff asserting a claim under the ADA must bring a complaint of workplace discrimination to the EEOC within 300 days of an incident's occurrence, and then file a related lawsuit within 90 days of receiving a notice of right to sue from the EEOC. *See Bowens v. Corr. Ass'n of New York*, No. 19-CV-1523 (PKC) (CLP), 2019 WL 1586857, at *5 (E.D.N.Y. Apr. 12, 2019); *Tiberio v. Allergy Asthma Immunology of Rochester*, 664 F.3d 35, 38 (2d Cir. 2011).  This filing period operates as a statute of limitations, so the failure to file a timely administrative complaint will bar a plaintiff's claims. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act.  The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred.").

In this case, Plaintiff filed her EEOC complaint on September 29, 2017 and timely filed this action after receiving a right-to-sue letter from the EEOC.  (SAC, Dkt. 13, at 27; *see* Complaint, Dkt. 1.)  Accordingly, Plaintiff's ADA claims, with the exception of hostile work environment, may be based upon alleged violations that occurred after December 3, 2016. *Cf. Bowen-Hooks*, 13 F. Supp. 3d at 205 ("[T]he entire time period of the alleged hostile environment may be considered . . . if an act contributing to the claim occurs within the filing period.") (internal quotations and citation omitted).

Unlike the ADA, the Rehabilitation Act does not contain a specific statute of limitations. *Morse v. Univ. of Vt.*, 973 F.2d 122, 125 (2d Cir. 1992).  In the absence of an express statute of limitations, the Second Circuit has held "that actions under § 504 of the Rehabilitation Act are governed by the state statute of limitations applicable to personal injury actions." *Id.* at 127.  In

New York, the statute of limitations for personal injury actions is three years. *See Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002); *see also* N.Y. C.P.L.R. § 214(5). Thus, Plaintiff may only assert her claims under the Rehabilitation Act as to Defendants' actions after July 20, 2015.

### B.     ADA Exhaustion of Administrative Remedies

"Exhaustion of administrative remedies . . . [is a] precondition[] to filing an ADA action in federal court."[24] *Cohn v. KeySpan Corp.*, 713 F. Supp. 2d 143, 155 (E.D.N.Y. 2010).

> [C]laims not raised in an EEOC complaint may be brought in federal court if they are reasonably related to the claim filed with the agency. A claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made.

*Gomez v. New York City Police Dep't*, 191 F. Supp. 3d 293, 299 (S.D.N.Y. 2016) (alterations and citations omitted).

Plaintiff did not present her ADA claims to the EEOC and only focused on age discrimination and retaliation. (*See* Plaintiff's EEOC Complaint, Dkt. 20-3.) At no point does Plaintiff's EEOC complaint reference, even in passing any discrimination on the basis of disability. Because Plaintiff did not make any factual allegations in her EEOC complaint describing conduct prohibited by the ADA, her ADA claims are not reasonably related to the age-based discrimination she alleged before the EEOC and in the SAC. *See Roth v. Farmingdale Pub. Sch. Dist.*, No. 14-CV-6668 (JFB) (ARL), 2017 WL 395211, at *9 (E.D.N.Y. Jan. 30, 2017) (finding that claims of gender and disability were not reasonably related to allegations of discrimination on the basis of age, marital status, or arrest record). Therefore, Plaintiff's ADA claims are dismissed for failure

---

[24] "Unlike ADA claims, exhaustion of administrative remedies is not a condition precedent to [Rehabilitation Act claims]." *Cohn*, 713 F. Supp. 2d at 158.

to exhaust. However, out of an abundance of caution, given Plaintiff's *pro se* status, the Court addresses the merits of her ADA/Rehabilitation Act claims.

### C.    Disability Discrimination under the ADA/Rehabilitation Act

To state a *prima facie* claim of employment discrimination under the ADA and the Rehabilitation Act, a plaintiff must plausibly allege that, *inter alia*, (1) she is disabled within the meaning of the statute; (2) she suffered an adverse employment action; and (3) the adverse employment action was imposed because of her disability. *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015); *Day v. MTA N.Y.C. Transit Auth.*, No. 17-CV-07270 (VSB), 2019 WL 1437616, at *4 (S.D.N.Y. Mar. 31, 2019).

Defendants move to dismiss these claims on the grounds that Plaintiff's allegations fail to establish that she was disabled.[25] The Court agrees. The SAC is completely devoid of allegations that Plaintiff is disabled. Plaintiff alludes to "a serious illness" which required "repetitive doctor's appointments and absences" in 2011, but does not identify the illness or allege that the illness had lasting effects. (SAC, Dkt. 13, at 17.) Similarly, Plaintiff mentions "a medical procedure" for which she applied for FMLA leave in May 2016, but does not allege any more than that. (*Id.* at 18.)

Accordingly, Plaintiff's ADA and Rehabilitation Act claims for disability discrimination are dismissed.

### D.    Retaliation under the ADA/Rehabilitation Act

Plaintiff "need not allege a disability to sustain a retaliation claim" under the Rehabilitation Act or ADA. *Emmons v. City Univ. of New York*, 715 F. Supp. 2d 394, 410 (E.D.N.Y. 2010),

---

[25] The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).

*modified* (July 2, 2010). To state a *prima facie* case of retaliation under the ADA and Rehabilitation Act, a plaintiff must allege that "(1) [the d]efendants took an adverse employment action against [her], (2) because [s]he opposed an employment practice made unlawful by the ADA or Rehabilitation Act." *Johnson v. N.Y. State Office of Alcoholism*, No. 16-CV-9769 (RJS), 2018 WL 1353258, at *4 (S.D.N.Y. Mar. 13, 2018); *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (stating that retaliation claims under the Rehabilitation Act and ADA are governed by the same standards).

Plaintiff fails to allege that she suffered an adverse employment action following her involvement in protected activity. The first time Plaintiff raised any objection related to alleged disability discrimination was when she filed this lawsuit on July 20, 2018. Plaintiff alleges that after she initiated this action, Gergen decided to replace a day-shift position with a night-shift position (but not affecting Plaintiff, who works during the day), that O'Neal refused to communicate with Plaintiff, and that Plaintiff was no longer responsible for giving safety talks.[26] (SAC, Dkt. 13, at 11, 23−26.) While the definition of adverse employment action is broader in the context of retaliation than in the context of discrimination, none of Plaintiff's allegations rise to that level. *See Millea*, 658 F.3d at 165 ("'[P]etty slights, minor annoyances, and simple lack of good manners will not' give rise to actionable retaliation claims." (internal citation omitted)); *Giraud v. Bd. of Educ., Newburgh Enlarged City Sch. Dist.*, No. 12-CV-1842 (ER), 2013 WL

---

[26] Plaintiff also alleges that O'Neal regularly sends Plaintiff's supervisor, Bernero, emails complaining that Plaintiff is "incompetent" and "insubordinate." (SAC, Dkt. 9−10.) Plaintiff does not provide a time period when this behavior started, but discusses this action in the context of "a campaign of slander" that O'Neal started after Plaintiff's EAP complaint in 2008. (*Id.* at 8−9.) Because this "campaign" started years ago, it cannot constitute retaliation for Plaintiff's July 20, 2018 filing of the instant lawsuit. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001), *as amended* (June 6, 2001) (noting that temporal proximity cannot establish causation if "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity").

3776242, at *7 n.7 (S.D.N.Y. July 17, 2013) ("[The d]efendant's refusal to meet with [the p]laintiff regarding any issues arising out of her employment does not qualify as adverse employment action [for the ADA retaliation claim]." (internal quotation marks and citation omitted)); *Taylor*, 2012 WL 5989874, at *10 ("[T]hreats to demote the plaintiff or take disciplinary action [do not] constitute an adverse employment action, even for purposes of a retaliation claim."). Accordingly, Plaintiff's retaliation claims under the ADA and the Rehabilitation Act are dismissed.

### E. Hostile Work Environment in Violation of the ADA/Rehabilitation Act

To state a hostile work environment claim under both acts, a plaintiff must allege she suffered conduct that "(1) is objectively severe or pervasive; (2) creates an environment that the plaintiff . . . subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [disability]." *Nadel v. Shinseki*, 57 F. Supp. 3d 288, 299 (S.D.N.Y. 2014) (internal quotations and citation omitted). For the reasons stated *supra*, Plaintiff fails to allege a disability and, therefore, her hostile work environment claims are dismissed.

## V. Claims Under the ADEA

"The ADEA prohibits employers from refusing to hire, discharging, or otherwise discriminating against an employee with regard to compensation, terms, conditions or privileges of employment because of age." *Hrisinko v. N.Y.C. Dep't of Educ.*, 369 F. App'x 232, 234 (2d Cir. 2010) (summary order); *see* 29 U.S.C. § 623(a)(1). "The ADEA's protections apply to individuals 'at least 40 years of age.'" *Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 166 (E.D.N.Y. 2015) (quoting 29 U.S.C. § 631(a)). "In addition to prohibiting discrimination, the ADEA makes it unlawful for an employer to retaliate against an individual for opposing such age discrimination." *Id.* (quoting *Ostrowski v. Atl. Mut. Ins. Co.*, 968 F.2d 171, 180 (2d Cir. 1992)) (internal quotation marks omitted). Additionally, "[a] hostile work environment

is [a] form of disparate treatment . . . on the basis of age under the ADEA." *Id.* (citing *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)).

In light of the Court's sovereign immunity analysis, *supra*, Plaintiff may assert discrimination, retaliation, and hostile work environment claims under the ADEA against the Individual Defendants in their official capacities.[27]

### A.      Statute of Limitations for an ADEA Claim

"Under the ADEA, [a plaintiff] must file a claim with the EEOC within 300 days of the discriminatory action." *Schiappa, Sr. v. Brookhaven Sci. Assocs., LLC*, 403 F. Supp. 2d 230, 234 (E.D.N.Y. 2005); *see* 29 U.S.C. §§ 626(d)(1)–(2).

> If the conduct complained of in the complaint falls outside of the 300-day period, the person can recover for that conduct only if it is demonstrated that there was a continuous policy and practice of discrimination, and that one act in furtherance of the policy and practice fell within the 300-day period.

*Schiappa, Sr.*, 403 F. Supp. 2d at 234 (citing *Bonner v. Guccione*, 178 F.3d 581, 584 (2d Cir. 1999)). "Claims for a hostile work environment, which may involve a series of acts not actionable on their own, may properly include acts outside the 300-day period for purposes of establishing a hostile environment provided that an act contributing to the claim occurs within the filing period." *Id.* (quoting *Nat'l R.R. Passenger Corp.*, 536 U.S. at 117) (internal quotation marks and brackets omitted).

Plaintiff filed her EEOC complaint on September 29, 2017, meaning that Plaintiff's claims are time-barred to the extent that they are based on discrete acts that occurred before December 3, 2016.  Because Plaintiff also asserts a hostile work environment claim, acts that occurred before

---

[27] As stated *supra*, Plaintiff's ADEA claims against the Individual Defendants in their official capacities are limited to prospective injunctive relief.

December 3, 2016 may be considered part of a continuous policy, depending on the allegations in the SAC.

## B.    Discrimination under the ADEA

"Courts analyzing claims of employment discrimination under the ADEA apply the three-step *McDonnell Douglas* burden-shifting framework." *Jones v. Target Corp.*, No. 15-CV-4672 (MKB), 2016 WL 50779, at *4 (E.D.N.Y. Jan. 4, 2016); *see also id.* (requiring the plaintiff to first prove a *prima facie* case, thereby shifting the burden to the defendant to justify the adverse action, and, in that event, requiring the plaintiff to show pretext).   A *prima facie* discrimination claim under the ADEA requires a plaintiff to "show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced [an] adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010).   "[A]t the motion to dismiss stage, an ADEA plaintiff need not plead every element of a prima facie case, only facts which plausibly suggest that (1) the employer took an adverse [employment] action and (2) age was the 'but for' cause of that adverse action." *Boonmalert v. City of New York*, 721 F. App'x 29, 32 (2d Cir. 2018) (summary order) (citing *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86−87 (2d Cir. 2015)).

### 1.    Adverse Employment Action

An adverse employment action is "a 'materially adverse change' in the terms and conditions of employment." *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (internal citation omitted).   It is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks and citation omitted).   Examples include "termination of employment, a demotion

evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Terry*, 336 F.3d at 138 (internal quotations and citations omitted). As there are "no bright-line rules," the Court must "pore over each case to determine whether the challenged employment action reaches the level of adverse." *Islamic Soc'y of Fire Dep't Pers. v. City of New York*, 205 F. Supp. 2d 75, 83 (E.D.N.Y. 2002) (internal quotations and citation omitted).

Here, Plaintiff does not sufficiently allege an adverse employment action. Plaintiff alleges that the Individual Defendants denied Plaintiff a classification and compensation review in 2017.[28] Although, "[u]nder the law of the Second Circuit, the denial of a salary increase is [] sufficiently material to constitute an adverse employment action[,]" *Nidzon v. Konica Minolta Bus. Sols., USA, Inc.*, 752 F. Supp. 2d 336, 349 (S.D.N.Y. 2010); *see Giordano-Forkan v. N.Y.C. Dep't of Educ.*, No. 13-CV-6950 (GBD), 2014 WL 5369426, at *3 (S.D.N.Y. Oct. 17, 2014) ("An action resulting in the denial of a pay raise can qualify as an adverse employment action."); *Mandel v. Champion Int'l Corp.*, 361 F. Supp. 2d 320, 326 (S.D.N.Y. 2005) ("[A] denial of a pay increase, if proven, would constitute an adverse employment action."),[29] "if the plaintiff can cite no facts suggesting that discretionary pay was awarded as a matter of course or that she was otherwise entitled to

---

[28] Gergen prompted Plaintiff to request a classification and compensation review on February 10, 2017, and informed Plaintiff that the dean had "signed off" on it on March 1, 2017. (SAC, Dkt. 13, at 17.) Gergen, however, notified Plaintiff on July 17, 2017 that all raises were on hold at the University. (*Id.*) Although the Individual Defendants did not have the final authority over Plaintiff's pay according to Plaintiff's allegations, the Court construes Plaintiff's allegations in her favor and infers that the Individual Defendants, as her supervisors, could have taken part in the denial of a pay increase.

[29] *But see Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 582–83 (S.D.N.Y. 2013) ("Failure to provide an employee with a raise may constitute an adverse employment action where Plaintiff can show that she was denied a salary increase received by similarly situated individuals as a result of discrimination.").

expect or rely on it, the employer's decision not to award [the pay] does not change the terms or conditions of Plaintiff's employment," so as to establish an adverse employment action. *Davis v. N.Y.C. Dep't of Educ.*, No. 10-CV-3812 (KAM) (LB), 2014 WL 917142, at *7 (E.D.N.Y. Mar. 7, 2014) (internal citation, alteration, and quotation marks omitted), *aff'd*, 804 F.3d 231 (2d Cir. 2015); *see Boyar v. City of New York*, No. 10-CV-65 (HB), 2010 WL 4345737, at *3 (S.D.N.Y. Oct. 28, 2010) ("failure to provide [discretionary pay] does not pass the test for an 'adverse employment action.'"). Here, Plaintiff does not explain how she was entitled to the pay increase at issue "as a matter of course," *see Davis*, 2014 WL 917142, at *7, nor does she allege that other assistant curators or employees in her department with similar experience or seniority received such a classification and compensation review or a pay increase. Indeed, Plaintiff did not apply for the classification and compensation review at issue until she was prompted by Gergen to do so on February 10, 2017. (SAC, Dkt. 13, at 16.) Plaintiff was then informed on July 17, 2017, that all raises at the University were on hold, implying no other employees received a raise. (*Id.* at 17.) Therefore, the Court does not find that this alleged denial of a pay increase to be an adverse employment action.

Plaintiff's allegations that Individual Defendants gave Plaintiff additional duties under the Grid, took away her responsibility for giving safety talks, and threatened to change Plaintiff's hours from days to nights are insufficient as well. "[A] change in duties or job reassignment may be an adverse employment action, if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career." *Bruder v. Jewish Bd. of Family & Children's Servs.*, No. 10-CV-5951 (MKB), 2013 WL 789231, at *5 (E.D.N.Y. Mar. 4, 2013) (citing *Galabya*, 202 F.3d at 641). However, Plaintiff fails to allege any facts demonstrating that the changes in her duties were "so significant as to constitute a setback to [her] career." *Id.*

35

As to the rest of Plaintiff's allegations, the Court similarly finds that they do not rise to the level of an adverse employment action. Plaintiff alleges that the Individual Defendants' downgrading of her annual performance evaluations in 2016 and 2017 *could* have an effect on raises and promotions. Yet, she fails to allege that such a materially adverse effect has actually occurred. *See Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 217 (E.D.N.Y. 2014) ("For purposes of an employment discrimination claim, a negative performance evaluation, absent any subsequent discipline or material impact, such as an effect on plaintiff's promotion opportunities or pay, is not an adverse employment action.").[30] Plaintiff alleges that Gergen required office-wide notices about employees on leave, "opening up people to censure . . . and discourage[ing] [people] . . . from taking days off" (SAC, Dkt. 13, at 20); that Gergen yelled at Plaintiff (*id.* at 10); that Gergen decided to replace a position for the day shift with a position for the night shift, when Plaintiff works the day shift (*id.* at 23); that O'Neal refused to interact directly with her after this lawsuit was filed (*id.* at 24); that the Individual Defendants did not assign Plaintiff a second desk, and that they did not give Plaintiff access to a lounge area (*id.* at 22−23). These actions by themselves plainly do not rise to the level of "a materially adverse change in the terms and conditions of employment." *See Sanders*, 361 F.3d at 755 (internal quotation marks omitted); *see also Cunningham v. New York State Dep't of Labor*, 326 F. App'x 617, 619 (2d Cir. 2009) (summary order) (finding exclusion of plaintiff from a hiring decision and reassignment of offices were not adverse employment actions); *Mills v. S. Conn. State Univ.*, 519 F. App'x 73, 75 (2d Cir. 2013) (summary order) (finding remarks, intimidating behavior, and shunning were not adverse

---

[30] The Court again notes the more demanding standard with respect what constitutes an adverse employment action for purposes of a discrimination versus a retaliation claim. Thus, as the Court has found, the downgrading of Plaintiff's performance evaluation could constitute an adverse employment action for her FMLA retaliation claim, it is insufficient for her ADEA discrimination claim.

employment actions); *Klein v. New York Univ.*, 786 F. Supp. 2d 830, 847 (S.D.N.Y. 2011) (finding undesirable assignments and undesirable offices not adverse employment actions); *Valenti v. Massapequa Union Free Sch. Dist.*, No. 09-CV-977 (JFB) (ARL), 2012 WL 1038811, at *14 (E.D.N.Y. Mar. 28, 2012) ("Not receiving a requested or desired assignment is not an adverse employment action.").

Therefore, the Court finds that Plaintiff has not alleged an adverse employment action.

### 2.    Inference of Discrimination for ADEA Claim

"It is well-settled that an inference of discriminatory intent may be derived from a variety of circumstances," *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009), including "[i]nvidious comments about people in the protected age class; more favorable treatment of younger employees; criticism of an employee's work performance in age-related degrading terms; a sequence of events leading to an employee's termination; or the timing of the termination," *Brenner v. City of New York Dep't of Educ.*, 132 F. Supp. 3d 407, 420 (E.D.N.Y. 2015), *aff'd*, 659 F. App'x 52 (2d Cir. 2016) (summary order).  However, "[h]ostility or unfairness in the workplace that is not the result of discrimination against a protected characteristic is simply not actionable." *Sethi v. Narod*, 12 F. Supp. 3d 505, 536 (E.D.N.Y. 2014).

Plaintiff does not allege any facts giving rise to an inference of age-related discrimination. Plaintiff alleges that the Individual Defendants called Plaintiff and two other older employees a "cabal" and "toxic," and that O'Neal called Plaintiff "anti-student" and "disorganized."  (SAC, Dkt. 13, at 9−10, 12.)  Plaintiff also alleges that O'Neal made it known that he intended to "get rid of the dead wood" and "replac[e] them with young, fresh faces," and that Gergen once said, "[I don't] even know why [Plaintiff] work[s] [here]."  (*Id.* at 6, 10.)  However, most of these remarks do not relate to Plaintiff's age at all.  The only age-related remark, "get rid of the dead wood" and

"replac[e] them with young, fresh faces," first occurred in 2007.[31] (*Id.* at 6.) Plaintiff's allegations do not show a nexus between the remark and any adverse employment action, especially since neither Plaintiff nor any other older employee has been replaced by a younger employee. *See Brenner*, 132 F. Supp. 3d at 420 ("Such remarks about a protected class do not themselves give rise to an inference of discrimination . . . unless they are accompanied by other evidence of discrimination or a plaintiff demonstrates a 'nexus' between the remark and the adverse employment action."). Indeed, it has been twelve years since O'Neal allegedly made his intention to replace "dead wood" with "younger, fresh faces" known; yet, Plaintiff does not allege that any older person has been replaced by a younger employee. What is more, Plaintiff obtained her tenure status in 2013, *after* O'Neal and Gergen became her supervisors. (SAC, Dkt. 13, at 6.)

Plaintiff also fails to allege more favorable treatment of younger employees. Although Plaintiff claims that the younger employees in her department were given a second desk to work at and were granted access to a faculty lounge/lab, she does not allege that "[t]he employees' positions, job responsibilities, and reporting structures" are materially similar. *See Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 21 (E.D.N.Y. 2015). Indeed, Plaintiff alleges that the younger employees in question work on a different floor and are only responsible for the fundamental labs, while Plaintiff and the other older assistant curators are responsible for both fundamental labs and the upper division labs.

In reality, Plaintiff does not allege a disparate impact claim, *i.e.*, that Plaintiff was subject to "practices that are not intended to discriminate but in fact have a disproportionately adverse effect on" the protected group, *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009); rather, she appears

---

[31] Plaintiff alleges that O'Neal thereafter repeated the "dead wood" phrase to Plaintiff, Wilkinson, de Figueroa, and others. (*Id.* at 6.)

to argue that action taken by the Individual Defendants as to all employees that adversely affected the older employees, but not the younger ones, constituted adverse employment action. For example, Plaintiff alleges that although the Individual Defendants uniformly downgraded all employees' evaluations—because Gergen believed that no one should get a perfect score—the older employees suffered more, when their downgraded evaluations were compared to their prior "perfect" evaluations. (SAC, Dkt. 13, at 15.) Plaintiff also alleges that the older employees and the younger employees mainly worked on different floors, so when Gergen gave all employees the "Grid" assignment, which was to be done on the floor the younger employees worked, it affected the older employees adversely, forcing them to "shuttle" from floor to floor, "room to room." (*Id.* at 21.) However, the fact that younger and older employees may have been affected differently by the same practice, without more, does not give rise to an inference of discrimination and Plaintiff does not allege additional facts showing that such difference was due to discriminatory intent. *See Batchelor v. City of New York*, 12 F. Supp. 3d 458, 476 (E.D.N.Y. 2014) (holding that the policy of not having a locker room, affecting males and females differently, does not give rise to an inference of discrimination).

Accordingly, the Court finds that Plaintiff has not sufficiently alleged an adverse employment action or an inference of discrimination, and her ADEA claim should be dismissed.

### C. Retaliation under the ADEA

"Like discrimination claims, courts analyze ADEA . . . retaliation claims under the *McDonnell Douglas* burden-shifting standard." *Ehrbar*, 131 F. Supp. 3d at 32. Accordingly, to establish a *prima facia* case of ADEA retaliation, a plaintiff must establish that "(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and

that adverse action."  *Id.* at 33 (citing *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam)).

> The contours of adverse employment action are defined more broadly under the ADEA's anti-retaliation provision than under its antidiscrimination provision.  In retaliation cases, the ADEA does not define adverse employment action only in terms of discharge or demotion; rather . . . any action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination" could constitute retaliation.

*Mabry v. Neighborhood Def. Serv.*, 769 F. Supp. 2d 381, 398 (S.D.N.Y. 2011) (internal citations omitted).

Defendants argue that Plaintiff fails to allege any adverse employment action to support her ADEA retaliation claim.  The Court agrees.  Plaintiff's first complaint about discrimination on the basis of age was made in her EEOC complaint filed on September 27, 2017.  (SAC, Dkt. 13, at 27.)  Plaintiff's 2008 complaint to EAP about unfair or abusive treatment, which resulted in a union-supervised mediation, and her 2016 and 2017 complaints to Labor Relations and the union about her downgraded evaluations, did not relate to age discrimination and thus are irrelevant to her ADEA retaliation claim.  *See D'Amore v. City of New York*, No. 17-CV-1748 (PKC) (ST), 2019 WL 2571157, at *6 (E.D.N.Y. June 21, 2019) ("[M]ere complaints of unfair treatment by an individual are not protected speech.") (internal quotations and citation omitted); *id.* ("[T]he burden is on the plaintiff to clarify to the employer that he is complaining of unfair treatment *due to his membership in a protected class* and that he is not complaining merely of unfair treatment generally.") (internal quotations and citation omitted).[32]  Therefore, Plaintiff can only rely on the

---

[32] Plaintiff contends that the Individual Defendants retaliated against her because of her connection with another employee's EEOC complaint and lawsuit, but does not explain the connection or allege that the other employee raised ADEA claims.  (SAC, Dkt. 13, at 12−13.)

Individual Defendants' actions that followed her EEOC complaint, that is, after September 27, 2017.

As to that time frame, Plaintiff alleges in support of her ADEA retaliation claim that: (1) Gergen required department-wide distribution of email notices about people being on leave; (2) Gergen replaced a day-shift position with a night-shift position; (3) Gergen threatened to change Plaintiff's hours from days to nights (which has not come to pass); (4) O'Neal refused to communicate directly with Plaintiff; and (5) Plaintiff's responsibility for giving safety talks was taken away from her.[33] None of these actions rise to the level of an adverse employment action even under the ADEA's more expansive definition. These actions, at worst, are inconveniences and less than optimal work conditions that would not "dissuade a reasonable employee from making or supporting a charge of [ADEA] discrimination." *Millea*, 658 F.3d at 164; *see Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 571 (2d Cir. 2011) ("Courts interpreting *Burlington Northern* have held that empty verbal threats do not cause an injury, and therefore are not materially adverse actions, where they are unsupported by any other actions.") (internal quotations and citation omitted).

For the reasons stated here and *supra*, Plaintiff's ADEA retaliation claim is dismissed.

### D. Hostile Work Environment

"The analysis of the hostile working environment theory of discrimination is the same under the ADEA as it is under Title VII." *Giordani v. Legal Aid Soc'y*, No. 17-CV-5569 (ILG), 2018 WL 6199553, at *2 (E.D.N.Y. Nov. 27, 2018) (quoting *Brennan v. Metro. Opera Ass'n, Inc.*,

---

[33] As noted in n.26, O'Neal's email about Plaintiff being "incompetent" and "insubordinate," which was allegedly part of O'Neal's "campaign of slander" that started years ago, cannot constitute retaliation for Plaintiff's September 27, 2017 EEOC complaint. *See Slattery*, 248 F.3d at 95 (noting that temporal proximity cannot establish causation if "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity").

192 F.3d 310, 318 (2d Cir. 1999)).  A hostile work environment claim must allege a "workplace [that] is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the [plaintiff's] employment."  *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 240 (2d Cir. 2007) (internal quotations and citation omitted).  To state a claim for a hostile work environment, a plaintiff must plead that the conduct: "(1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's age." *Fordham v. Islip Union Free Sch. Dist.*, 662 F. Supp. 2d 261, 271 (E.D.N.Y. 2009) (internal quotation marks and brackets omitted) (citing *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)).  Courts assess hostility based on the totality of circumstances and might consider: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Lebowitz v. New York City Dep't of Educ.*, No. 15-CV-2890 & No. 15-CV-5548 (LDH) (ST), 2017 WL 1232472, at *14 (E.D.N.Y. Mar. 31, 2017).  To survive a motion to dismiss, "a plaintiff need only plead facts sufficient to support the conclusion that she was faced with harassment of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Patane*, 508 F.3d at 113 (internal quotations, alternations, and citations omitted).

The Court finds that Plaintiff has plausibly alleged a claim for hostile work environment under the ADEA.  O'Neal proclaimed his intention to "get rid of the dead wood" and "replac[e]

them with young, fresh faces"[34] and that Gergen said "[I don't] even know why [Plaintiff] work[s] [here]." (SAC, Dkt. 13, at 6, 10.) O'Neal and Gergen referred to Plaintiff and two other older employees as "toxic" and a "cabal." (*Id.* at 10, 12.) O'Neal regularly called Plaintiff "anti-student" and "disorganized" in front of students and colleagues. (*Id.* at 9.) O'Neal regularly emailed Plaintiff's supervisor, Bernero, with complaints about Plaintiff being "incompetent" and "insubordinate," and once offered to help Bernero "get [Plaintiff] in line." (*Id.* at 9–10.) There were various incidents since 2016 where (1) Plaintiff's efforts to apply for a raise were thwarted; (2) Plaintiff's performance evaluations were downgraded; (3) Plaintiff was assigned to tasks that conflicted with her other duties; (4) Plaintiff was not given her own desk, when the younger employees were given theirs; (5) Plaintiff was not given access to a faculty lounge area, when the younger employees were; and (6) Plaintiff was threatened with changes to her hours. (*Id.* at 11–17, 21–26.) Additionally, Plaintiff and Gergen had an argument on August 18, 2017, during which Gergen got "[r]ed-faced" and was "spitting and screaming at [Plaintiff]." (*Id.* at 10.) Gergen also "stuck his finger in [Plaintiff's] face and advanced on [Plaintiff] such that [she] had to back up or be jabbed by his finger. He was still screaming when he backed [Plaintiff] into the wall." (*Id.*)

Drawing all inferences in Plaintiff's favor, the Court finds that the combination of all of these acts gives rise to a plausible inference that the conditions of Plaintiff's employment were altered for the worse based on age-based hostility. *See Kassner*, 496 F.3d at 235–36 (finding sufficient allegations of undesirable assignments of work shifts and repeated degrading comments,

---

[34] The Court understands that this comment was first stated in 2007 and repeated at unspecified times thereafter to Plaintiff and others. (SAC, Dkt. 13, at 6.) However, the Court takes the comment as providing context for, and informing Plaintiff's perception of, the Individual Defendants' alleged hostility toward older employees, which also manifested itself in other comments and actions by the Individual Defendants.

"including, but not limited to, 'drop dead,' 'retire early,' 'take off all of that make-up,' and 'take off your wig'" (alteration omitted)).

Accordingly, Plaintiff's hostile work environment claim under the ADEA will proceed against the Individual Defendants.

## VI.    Plaintiff's Constitutional Claims

Plaintiff asserts that she is bringing claims pursuant to "42 U.S.C. § 1983 and the 14th [Amendment] Due Process [C]lause to the Constitution (retaliation by SUNY)" (SAC, Dkt. 13, at 3), and that she will be deprived of her property interests in her employment and the classification and compensation process (Pl.'s Br., Dkt. 24, at 6−7).

The Fourteenth Amendment to the United States Constitution states in part that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "To allege a procedural due process claim under the Fourteenth Amendment, the two threshold questions are[: (1)] whether the plaintiff possessed a liberty or property interest protected by the United States Constitution or federal statutes[;] and [2] if so, what process was due before the plaintiff could be deprived of that interest." *Laface v. E. Suffolk Boces*, 349 F. Supp. 3d 126, 157 (E.D.N.Y. 2018) (citation, quotation marks, and alterations omitted), *reconsideration denied*, No. 18-CV-01314 (ADS) (AKT), 2019 WL 1433095 (E.D.N.Y. Mar. 29, 2019).

"Property interests are not created by the Constitution, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Id.* (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985)). Public employees have property interests in their employment against acts of termination, suspension without pay, and diminution in rank. *Barnes v. Pilgrim Psychiatric Ctr.*, 860 F. Supp. 2d 194, 203 (E.D.N.Y. 2012) (citing *O'Connor v. Pierson*, 426 F.3d 187, 196 (2d Cir. 2005)).

However, "[d]iscretionary salary increases are not a form of property protected by the Constitution against deprivation without due process of law." *McRae v. N.Y. State Thruway Auth.*, 687 F. App'x 22, 23 (2d Cir. 2017) (summary order) (internal quotation marks and citation omitted); *see also Henneberger v. Cty. of Nassau*, 465 F. Supp. 2d 176, 192−93 (E.D.N.Y. 2006) (holding that the plaintiff did not have a property interest in increased compensation due under the collective bargaining agreement).

Plaintiff has not alleged that she has been deprived of a property interest. Plaintiff does not allege that she lost her employment, received less pay, or suffered a demotion. Instead, Plaintiff alleges that the she was denied a salary increase, as part of the 2017 classification and compensation review, when all raises were put on hold.[35] However, this allegation is insufficient to state a due process violation. *See McRae*, 687 F. App'x at 23; *see also Henneberger*, 465 F. Supp. 2d at 192−93 (dismissing the plaintiff's due process claim for a wage freeze); *Am. Fed'n of State, Cty. & Mun. Employees (a/k/a AFSCME), Local 264 v. Tobe*, No. 04-CV-753 (WMS), 2011 WL 6329908, at *6 (W.D.N.Y. Dec. 19, 2011) ("[T]he Due Process Clause is invoked to protect something more than an ordinary contractual right." (quoting *S & D Maint. Co. v. Goldin*, 844 F.2d 962, 966 (2d Cir. 1988)).

Accordingly, Plaintiff's § 1983 claim is dismissed for failure to state a claim.[36]

---

[35] Plaintiff contends in her opposition that during that period, "non-contractual pay increases were awarded to other employees and employees were hired during the so-called budget crisis." (Pl.'s Br., Dkt. 24, at 7.) The Court does not consider facts alleged for the first time in moving papers, especially considering Plaintiff has twice amended her complaint. *See Blue v. City of New York*, No. 16-CV-9990 (VSB), 2018 WL 2561023, at *12 n.12 (S.D.N.Y. June 4, 2018) (noting that "a plaintiff typically cannot amend a complaint through claims raised for the first time in an opposition").

[36] To the extent that Plaintiff also makes a substantive due process claim, the Court finds that the allegations do not satisfy the applicable standard for such a claim. *See Velez v. Levy*, 401 F.3d 75, 93 (2d Cir. 2005) ("For a substantive due process claim to survive a Rule 12(b)(6) dismissal motion, it must allege governmental conduct that is so egregious, so outrageous, that it

## VII.  State Law Claims

In addition to her federal claims, Plaintiff also asserts corresponding state law claims under the NYSHRL.  (*See* SAC, Dkt. 13, at 3.)  As per the Court's sovereign immunity analysis, *supra*, Plaintiff's state law claims may only be asserted against the Individual Defendants in their individual capacities.

"The NYSHRL allows for individual liability under two theories: [(1)] if the defendant has 'an ownership interest' in the employer or has 'the authority to hire and fire employees,' [N.Y. Exec. Law § 296(1)], [or (2)] if the defendant aided and abetted the unlawful discriminatory acts of others, N.Y. Exec. Law § 296(6)."  *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 521–22 (S.D.N.Y. 2015) (quotations and citations omitted).  Thus, "a co-worker who 'actually participates in the conduct giving rise to a discrimination claim' [can] be held liable under the NYSHRL even [if] that co-worker lacked the authority to either hire or fire the plaintiff."[37]  *Feingold v. New*, 366 F.3d 138, 158 (2d Cir. 2004).  Crucially, however, the liability of an employer must be established as a predicate to individual liability for aiding and abetting.  *See Jain v. McGraw-Hill Cos.*, 827 F.

---

may fairly be said to shock the contemporary conscience." (quotation marks and citations omitted)).

[37] There is a division of authority on the question of whether an individual may be held liable under the NYSHRL as an aider and abettor of *their own* discriminatory conduct.  *Compare Johnson v. Cty. of Nassau*, 82 F. Supp. 3d 533, 539 (E.D.N.Y. 2015) ("[An] employee [held liable] under Section 296(6) is not aiding and abetting his own conduct *per se*, but rather aiding and abetting the employer's violation, based on [the employer's] condonation or approval of the employee's conduct.") *and Tully-Boone v. N. Shore-Long Island Jewish Hosp. Sys.*, 588 F. Supp. 2d 419, 427 (E.D.N.Y. 2008) ("[The defendant] may be held liable for aiding and abetting allegedly unlawful discrimination by her employer even where her actions serve as the predicate for the employer's vicarious liability."), *with Bliss v. MXK Restaurant Corp.*, 220 F. Supp. 3d 419, 426 (S.D.N.Y. 2016) ("[A]s a matter of law as well as logic, 'an individual cannot aid or abet his or her own violation of the Human Rights Law.'" (quoting *Hardwick v. Auriemma*, 983 N.Y.S.2d 509, 513 (1st Dep't 2014))); *see also Canonsa v. Ziff*, No. 18-CV-4115 (PAE), 2019 WL 498865, at *9 n.13 (S.D.N.Y. Jan. 28, 2019) (recognizing this division of authority).  Because Plaintiff's NYSHRL claims fail on other grounds, the Court need not resolve this question.

Supp. 2d 272, 277 (S.D.N.Y. 2011) ("[T]he NYSHRL and NYCHRL require 'that liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor.'" (quoting *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999))); *see also France v. Touro College*, No. 14-CV-4613 (NGG) (CLP), 2016 WL 1105400, at *9 (E.D.N.Y. Feb. 16, 2016) ("[I]ndividual liability under the NYSHRL cannot attach without corresponding liability for the employer enterprise."), *report and recommendation adopted*, 2016 WL 1117459 (E.D.N.Y. Mar. 21, 2016).

Here, Plaintiff has expressly characterized the University as her employer. (*See* SAC, Dkt. 13, at 3 (naming Plaintiff's place of employment as "Stony Brook University").) Though the Individual Defendants have supervisory authority over Plaintiff in the workplace, they clearly lack an ownership interest in the University, as well as the power to hire and fire Plaintiff. (*See id.* at 6 (stating that Plaintiff was granted tenure).)[38] In light of these allegations, Plaintiff must first establish a viable claim of liability against the University under § 296(1) of the NYSHRL; only then could she assert claims against the Individual Defendants under § 296(6) for aiding and abetting the University's violations of the NYSHRL. As discussed *supra*, however, Plaintiff cannot do so because the University and New York State are immune from NYSHRL claims under the Eleventh Amendment. Accordingly, Plaintiff's claims against the Individual Defendants in their individual capacities under the NYSHRL must be dismissed for failure to state a claim.[39] *See*

---

[38] Although Plaintiff alleges that O'Neal stated that he wanted to "get[] rid of the dead wood" in the department and "replac[e] them with young, fresh faces" (*id.* at 6), this is not enough from which to plausibly infer that O'Neal had the ability to hire or fire Plaintiff. Indeed, considering Plaintiff obtained tenure status in 2013, six years after O'Neal became her supervisor, it suggests, if anything, that O'Neal lacked that authority.

[39] Because Plaintiff's state law claims are dismissed in their entirety on these grounds, the Court need not decide whether and to what extent these claims would be limited or foreclosed by the doctrine of election of remedies. *See Moodie v. Fed. Res. Bank of N.Y.*, 58 F.3d 879, 884 (2d Cir. 1995); *see also* N.Y. Exec. Law § 297(9) ("Any person claiming to be aggrieved by an

*Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 253 (E.D.N.Y. 2015) ("Here, as [the p]laintiffs cannot

state a claim against CUNY under [the] NYSHRL and NYCHRL because the claims are barred by

the Eleventh Amendment, [the p]laintiffs also cannot state a claim against the Individual CUNY

Defendants in their individual capacities as aiders and abettors."); *see also Ren Yuan Deng v. N.Y.*

*State Office of Mental Health*, No. 13-CV-6801 (ALC), 2015 WL 221046, at *5 (S.D.N.Y. Jan.

15, 2015) (dismissing a plaintiff's NYSHRL claim against individual defendants because she could

not establish employer liability against the defendant in light of the Eleventh Amendment).

## CONCLUSION

For the reasons stated, Defendants' motion to dismiss is granted in part and denied in part.

Plaintiff's claims for prospective injunctive relief against the Individual Defendants in their official

capacities for FMLA retaliation and ADEA hostile work environment shall proceed to discovery,

along with Plaintiff's claims against the Individual Defendants in their individual capacities for

FMLA retaliation.  All other claims are dismissed.  Given that no claims remain against Defendants

University and New York State, they are terminated as parties to this action.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 30, 2019
      Brooklyn, New York

---

unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages, . . . unless such person had filed a complaint [with the NYSDHR] or with any local commission on human rights . . . .").